

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

**CRIMINAL NO. 12-20030**

**HONORABLE NANCY EDMUNDS**

vs.

**VIOLATIONS:**
**18 U.S.C. § 1341**
**18 U.S.C. § 1343**
**18 U.S.C. § 1346**
**D-1   JEFFREY BEASLEY,**              **18 U.S.C. § 1349**
**D-2   ROY DIXON,**                    **18 U.S.C. § 1951**
**D-4   PAUL STEWART,**                 **18 U.S.C. § 666**
**and**                                 **31 U.S.C. § 5324(a)(3)**
**D-5   RONALD ZAJAC,**

                    **Defendants.**
_____/

## SEVENTH SUPERSEDING INDICTMENT

The Grand Jury Charges that:

**D-1   JEFFREY BEASLEY**
**D-2   ROY DIXON**
**D-4   PAUL STEWART**
**D-5   RONALD ZAJAC**

## INTRODUCTION

Except where noted, from approximately January 2006 through April 2009:

1.   **JEFFREY BEASLEY** was a public official for the City of Detroit,

Michigan, that is, the Treasurer of the City of Detroit between January 2006 and

September 2008.   In addition, **JEFFREY BEASLEY** was a Trustee of the

General Retirement System and the Police and Fire Retirement System of the City of Detroit by virtue of his position as City Treasurer.   **JEFFREY BEASLEY** was appointed as City Treasurer by, and served at the pleasure of, the Mayor of the City of Detroit.

2.   Kwame Kilpatrick was the Mayor of the City of Detroit between January 2006 and September 2008.   In addition, Kwame Kilpatrick was a Trustee of the General Retirement System and the Police and Fire Retirement System of the City of Detroit by virtue of his position as Mayor.   Kwame Kilpatrick controlled the Kilpatrick Civic Fund, a purported non-profit entity.

3.   **PAUL STEWART** was a public official for the City of Detroit, Michigan, that is, a police officer for the City of Detroit.   In addition, **PAUL STEWART** was an elected Trustee of the Police and Fire Retirement System of the City of Detroit.

4.   The City of Detroit, Michigan maintained two pension funds for its employees: the General Retirement System and the Police and Fire Retirement System (collectively the "Retirement Systems").   These pension funds were overseen by Boards of Trustees.   The Trustees were obligated by law to act in good faith to best protect the interests of the retirees and beneficiaries.

5.   **ROY DIXON** was an investment adviser and the owner and founding member of *Onyx Capital Advisers, L.L.C.   Onyx Capital Advisers* was a company

2

formed in 2006 and headquartered in Detroit, Michigan.   **ROY DIXON** and *Onyx*
*Capital Advisers* operated a private equity fund known as *Onyx Capital Advisory*
*Fund I, LP.*   In addition, **ROY DIXON** sought investment money from the
Retirement Systems for a real estate investment in the Turks and Caicos Islands on
behalf of *PR Investment Group, Ltd.*, a company operating in the islands.

6.    **RONALD ZAJAC** was an attorney who served as the General Counsel of
the two Retirement Systems since 1982.

7.    The General Retirement System of the City of Detroit provided pension
and related benefits to retired City of Detroit employees and other beneficiaries,
such as surviving spouses, covered by the System's plan.   The General Retirement
System maintained trust funds consisting of contributions and earnings from those
contributions.   Funds from the General Retirement System were used to pay
benefits to retirees and beneficiaries, as well as to pay the expenses of the System.
As of June 30, 2008, the General Retirement System had 8,823 active members
and 11,388 retirees and beneficiaries.

8.    The General Retirement System was governed by a ten-member Board of
Trustees.   Six of the Trustees were elected, and one Trustee was selected by the
Mayor as a citizen representative.   In addition, the Board had three *ex-officio*
members, including the City Treasurer, the Mayor, and a member of the City
Council selected by the City Council.   It was the practice of the Mayor to

designate a representative when he was absent to sit in his place, with full voting power.   The Board of Trustees met on a weekly basis, making investment and other decisions based on a majority of those present and voting.

9.   The Police and Fire Retirement System of the City of Detroit provided pension and related benefits to retired City of Detroit employees who were police officers or fire fighters, and other beneficiaries, such as surviving spouses, covered by the System's plan.   The Police and Fire Retirement System maintained trust funds consisting of contributions and earnings from those contributions.   Funds from the Police and Fire Retirement System were used to pay benefits to retirees and beneficiaries, as well as to pay the expenses of the System.   As of June 30, 2008, the Police and Fire Retirement System had 4,078 active members and 8,442 retirees and beneficiaries.

10.   The Police and Fire Retirement System was governed by an eleven-member Board of Trustees.   Six of the Trustees were elected.   In addition, the Board had five *ex-officio* members, including the City Treasurer, the Mayor, the Fire Commissioner, the Chief of Police, and a member of the City Council selected by the City Council.   It was the practice of the Mayor, the Chief of Police, and the Fire Commissioner to designate a representative to sit in their place when they were absent, with full voting power.   The Board of Trustees met on a weekly basis, making investment and other decisions based on a majority of

4

those present and voting.

11.    As Treasurer for the City of Detroit, **JEFFREY BEASLEY** was an *ex officio* Trustee of the General Retirement System Board of Trustees and the Police and Fire Retirement System Board of Trustees.   **JEFFREY BEASLEY, PAUL STEWART**, and all Trustees are investment fiduciaries required to discharge their duties solely in the interest of the participants and beneficiaries and were prohibited by state law from dealing with the assets of the General Retirement System and the Police and Fire Retirement System in their own interest or from receiving any consideration for their own personal accounts from any party dealing with General Retirement System assets or Police and Fire Retirement System assets, as required by the Public Employee Retirement System Investment Act, M.C.L. §§ 38.1132c & 38.1133(7).   **JEFFREY BEASLEY, PAUL STEWART**, and all Trustees were also required by state law to discharge their duties solely in the interest of the General Retirement System and Police and Fire Retirement System participants and beneficiaries, including making investments for the exclusive purpose of providing benefits to the participants and beneficiaries of Detroit's two Retirement Systems.   M.C.L. § 38.1133(3).

12.    Michigan law prohibits public officials and agents, such as **JEFFREY BEASLEY** and **PAUL STEWART**, from accepting bribes.   M.C.L. §§ 750.118 & 750.125.

13.    At all times relevant to this Superseding Indictment, the City of Detroit

was a local government agency that received Federal assistance in excess of

$10,000 during each of the calendar years 2006, 2007, and 2008.

14.    All dates in this Superseding Indictment are alleged to have occurred on

or about the stated dates.

## COUNT 1

### (Conspiracy to Commit Honest Services Mail and Wire Fraud - 18 U.S.C. § 1349)

**D-1 JEFFREY BEASLEY**
**D-2 ROY DIXON**
**D-4 PAUL STEWART**
**D-5 RONALD ZAJAC**

1.    The allegations contained in paragraphs 1–14 of the Introduction of this

Superseding Indictment are realleged and incorporated by reference in this Count

1.    From approximately January 2006 to April 2009, in the Eastern District of

Michigan, Southern Division, and elsewhere, the defendants, **JEFFREY**

**BEASLEY, ROY DIXON, PAUL STEWART,** and **RONALD ZAJAC** did

unlawfully and knowingly conspire and agree with each other and with other

persons, known and unknown, to:

(A) Commit honest services mail fraud, in violation of Title 18, United States

Code, Sections 1341 and 1346; and

6

(B) Commit honest services wire fraud, in violation of Title 18, United States Code, Sections 1343 and 1346.

## THE SCHEME TO DEFRAUD

2.   From approximately January 2006 to April 2009, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendants, **JEFFREY BEASLEY, ROY DIXON, PAUL STEWART**, and **RONALD ZAJAC**, conspired with each other and with others to devise a scheme to defraud present and retired employees of the City of Detroit who contributed to the General Retirement System and the Police and Fire Retirement System of their right to the honest, faithful, and impartial services of Kwame Kilpatrick, **JEFFREY BEAS-LEY, PAUL STEWART**, *Trustee B*, *Trustee C*, and *City Official A*, including their right to their conscientious, loyal, faithful, disinterested, unbiased service, to be performed free of deceit, undue influence, conflict of interest, self-enrichment, self-dealing, concealment, bribery, fraud, and corruption, and to (1) cause matters and things to be placed in any post office and authorized depository to be sent and delivered by the Postal Service, (2) cause matters to be delivered by commercial interstate carrier according to the direction thereon, and (3) cause writings, signals, and sounds to be transmitted by wire in interstate and foreign commerce, for the purpose of executing and attempting to execute the scheme and artifice, as set forth below.

## OBJECTS OF THE SCHEME TO DEFRAUD

3.   It was an object of the scheme to defraud the employees and retirees of the City of Detroit that Kwame Kilpatrick, **JEFFREY BEASLEY**, **PAUL STEWART**, *Trustee B*, and *Trustee C* used their positions as Trustees of the Retirement Systems to personally enrich themselves and other co-conspirators by demanding or accepting bribes and kickbacks in the form of cash, travel, meals, golf clubs, drinks, tickets to sporting events, gambling money, tickets to shows, Playboy party tickets, hotel stays, entertainment, Las Vegas concert tickets, trips, designer watches, massages, limousine service, private plane flights, and other things of value from persons who dealt with the Retirement Systems which acted on their proposals or requests.   **JEFFREY BEASLEY**, **PAUL STEWART**, and their co-conspirators concealed and did not disclose these bribes and kickbacks.

4.   It was part of the scheme that **ROY DIXON** paid bribes and kickbacks to Kwame Kilpatrick, **JEFFREY BEASLEY**, **PAUL STEWART**, *Trustee B, Trustee C, City Official A*, and other individuals in order to secure investment monies from the Retirement Systems for *Onyx Capital Advisers* and *PR Investment Group*.   It was part of the scheme that Chauncey Mayfield paid bribes and kickbacks to Kwame Kilpatrick, **JEFFREY BEASLEY**, **PAUL STEWART**, *Trustee B*, and other individuals in order to secure investment monies and management fees from the Retirement Systems for *MayfieldGentry Realty Advisors* and to maintain his position as an investment advisor for the Retirement

8

Systems.   It was part of the scheme that **RONALD ZAJAC** paid bribes and

kickbacks to Kwame Kilpatrick, **JEFFREY BEASLEY, PAUL STEWART,**

*Trustee B*, and other individuals in order to maintain his position as General

Counsel to the Retirement Systems and to secure a substantial raise in

compensation as General Counsel.

    5.   It was a further object of the scheme to defraud that **JEFFREY**

**BEASLEY** pressured persons who dealt with the Retirement Systems to contribute

money to the Kilpatrick Civic Fund in return for his support of their requests or

proposals to the Retirement Systems.   **ROY DIXON** contributed $30,000 to the

Kilpatrick Civic Fund in order to secure support for investments by the Retirement

Systems proposed by *Onyx Capital Advisers* and *PR Investment Group*.   In

addition, **ROY DIXON** directed the owner of *Company N* to contribute $15,000 to

the Kilpatrick Civic Fund in order to secure support for investments by the

Retirement Systems proposed by *Onyx Capital Advisers*.   Chauncey Mayfield

contributed $50,000 to the Kilpatrick Civic Fund in order to secure support for

investments by the Retirement Systems proposed by *MayfieldGentry Realty*

*Advisors* and to secure the position of *MayfieldGentry Realty Advisors* as an

investment advisor to the Retirement Systems.   In order to gain favor with

Kwame Kilpatrick and **JEFFREY BEASLEY, RONALD ZAJAC** raised over

$70,000 for the Kilpatrick Civic Fund, soliciting funds from, among others,

individuals seeking investments from the Retirement Systems.

9

## METHODS OF ACCOMPLISHING THE SCHEME TO DEFRAUD

6.  To achieve the objects of the scheme to defraud, the defendants,

**JEFFREY BEASLEY, ROY DIXON, PAUL STEWART, RONALD ZAJAC,**

and their co-conspirators participated in various transactions and activities, which

included, but are not limited to, the following:

### *COMPANY A*

7.  In approximately 2007, the General Retirement System and the Police and

Fire Retirement System were each presented with investment proposals by

*Company A* which provided for the Retirement Systems to give a total of

approximately $44 million in financing for *Company B,* $22 million from the

General Retirement System and $22 million from the Police and Fire Retirement

System.   Under the proposals, the two Retirement Systems would provide this

money in order to purchase five *Company B* parts warehouses.   The warehouses

would then be leased back to *Company B.*   The proposed owner of the

warehouses, the *Company A Fund,* was represented by a principal of *Company A.*

The principal of *Company A* was a person who was an owner of the company and

the primary beneficiary of the profits that *Company A* would earn by obtaining the

funding of approximately $44 million from the two Retirement Systems.

8.  In approximately August 2007, at a restaurant in Detroit, **JEFFREY**

**BEASLEY** demanded $250,000 from the principal of *Company A* in exchange for

BEASLEY's support of *Company A's* proposals before both Retirement Systems. The principal of *Company A* agreed to pay **JEFFREY BEASLEY** the $250,000. During the course of the conspiracy, the principal of *Company A* made payments to **JEFFREY BEASLEY** amounting to approximately $70,000 in cash.   The principal of *Company A* paid this money to **JEFFREY BEASLEY** in order to secure his support for *Company A's* investment proposals to the two Retirement Systems.   Ultimately, *Company A's* principal discontinued payments on the entire amount demanded because **JEFFREY BEASLEY** left office as City Treasurer and Trustee in September 2008, following the resignation of Kwame Kilpatrick.

9.   On September 19, 2007, the General Retirement System passed a resolution that the System would invest $22 million with *Company A* on the condition that the General Retirement System receive a more favorable rate of return on its investment than previously proposed by *Company A*, and that the fees that would go to *Company A* would be significantly lower than what *Company A* had previously proposed.   **JEFFREY BEASLEY** was not present for the meeting at which this resolution was passed.

10.   The principal of *Company A* was upset by the action taken by the General Retirement System on September 19, 2007 because the resolution passed by the Board of Trustees would result in a far lower profit to *Company A*.   On the evening of September 19, 2007, the principal expressed his concern to **JEFFREY**

11

BEASLEY, and he asked JEFFREY BEASLEY to intervene with the Retirement

Systems on his behalf to change the result.   *Company A's* principal believed that

JEFFREY BEASLEY would intervene on his behalf because the principal had

agreed to pay BEASLEY the $250,000 that he had demanded.   JEFFREY

BEASLEY assured *Company A's* principal that he would resolve the problem.

11.   On the evening of September 19, 2007, *Company A's* principal spoke to

Kwame Kilpatrick by telephone.   The principal again expressed his concern

regarding the unfavorable resolution passed by the General Retirement System.

Kwame Kilpatrick assured the principal that he would take care of the problem.

12.   On September 20, 2007, the Police and Fire Retirement System, with

JEFFREY BEASLEY in attendance, addressed the request by *Company A* for the

other $22 million in investment money from that System.   The Board of Trustees

was presented with eight investment scenarios, each with a different rate of return

for the System and each with a different fee structure for *Company A.*   At the

direction of JEFFREY BEASLEY, one of the Trustees moved that the Board

approve the investment scenario desired by the principal of *Company A.*   This

scenario was the least beneficial for the Police and Fire Retirement System because

it required the lowest rate of return for the System from *Company A.*   In addition,

this scenario was the most beneficial scenario for *Company A* because it provided

for the highest management fees.   JEFFREY BEASLEY voted in favor of this

proposal, and the motion passed.   Four Trustees, including **PAUL STEWART** and *Trustee B*, voted against the proposal.

13.   At the September 26, 2007 meeting of the General Retirement System, with **JEFFREY BEASLEY** in attendance, the Trustees amended their September 19, 2007 resolution regarding the $22 million investment in the *Company A* deal so that *Company A* was given the same favorable terms as were given by the Police and Fire Retirement System.   **JEFFREY BEASLEY** voted in favor of this deal, which was the most beneficial to *Company A* and the least favorable to the Retirement System.

14.   In late November 2007, at a pension conference in New York, New York, **RONALD ZAJAC** told the principal of *Company A* to give money to **PAUL STEWART** and *Trustee B* in order to improve his relationship with them. Subsequently, the principal of *Company A* gave $2,500 in cash to **PAUL STEWART** and $2,500 in cash to *Trustee B*.

15.   On December 13, 2007, *Trustee B* brought a motion before the Police and Fire Retirement System to give final approval to the investment, to direct the execution of the transaction documents, and to approve the wire transfer of $16.9 million to *Company A*.   The motion passed, with **JEFFREY BEASLEY, PAUL STEWART**, and *Trustee B* all voting in favor.

16.   On multiple occasions during the course of the conspiracy, the principal

13

of *Company A* paid for hotel rooms at the Atheneum Hotel for use by **JEFFREY BEASLEY** and his paramour.

17. In approximately March 2008, the principal of *Company A* paid for a vacation in Miami Beach, Florida for **JEFFREY BEASLEY** and his paramour, including the costs of the plane flight, hotel stay, meals, and other expenses.

18. In early 2008, the principal of *Company A* gave approximately $2,500 in cash to **PAUL STEWART** and $2,500 in cash to *Trustee B* in Florida.

19. On March 11, 2008, the principal of *Company A* paid for an excursion from Florida to Freeport, Bahamas aboard a ship for **PAUL STEWART**, his paramour, and *Trustee B.*

20. Subsequent to the approval of the $44 million investments by the two Retirement Systems, *Company A* received millions of dollars in management and other fees from the Retirement Systems.

## KILPATRICK CIVIC FUND

21. While Treasurer of the City of Detroit and Trustee of the General Retirement System and the Police and Fire Retirement System, **JEFFREY BEASLEY** actively solicited donations to the Kilpatrick Civic Fund from persons and businesses who dealt with the two Retirement Systems.

22. **JEFFREY BEASLEY** told persons and businesses who dealt with the two Retirement Systems that they would receive favorable treatment from the

Retirement Systems if they donated to the Kilpatrick Civic Fund.   Numerous

persons and businesses solicited by **JEFFREY BEASLEY** donated to the

Kilpatrick Civic Fund with the hope of receiving favorable treatment for their

investment proposals by the Retirement Systems.

Over the course of the conspiracy, **JEFFREY BEASLEY** and other members of

the conspiracy voted in favor of investment proposals of persons and businesses

because the person or business had donated or would donate to the Kilpatrick Civic

Fund.   During the course of the conspiracy, **JEFFREY BEASLEY** was paid an

annual salary of approximately $120,000 as City Treasurer.   **JEFFREY**

**BEASLEY's** work in soliciting and obtaining donations to the Kilpatrick Civic

Fund enhanced **BEASLEY's** position as Treasurer with Mayor Kwame Kilpatrick,

at whose pleasure **BEASLEY** served, so that **BEASLEY** continued to serve as

Trustee of both Retirement Systems, where he wielded power over people and

businesses seeking investment money from the Systems by virtue of his position.

In order to secure favor with **JEFFREY BEASLEY** and Kwame Kilpatrick,

**RONALD ZAJAC** acted as a fund raiser for the Kilpatrick Civic Fund, soliciting

donations for the Kilpatrick Civic Fund from individuals seeking investment

money from the Retirement Systems and from attorneys seeking business from the

Retirement Systems.   During the course of the conspiracy, **RONALD ZAJAC**

raised over $70,000 for the Kilpatrick Civic Fund.   Examples of some of the

persons and businesses that gave money to the Kilpatrick Civic Fund and received

favorable treatment from **JEFFREY BEASLEY** and the Retirements Systems

include, but are not limited to, the following:

23. ***Company C and Company D***

    A.   *Company C* and *Company D* were closely associated through a

person who was a principal in both companies (hereinafter "Principal of

*Companies C and D*").   These companies offered investment management

services for a fee.

    B.   In July 2006, the Principal of *Companies C and D* was instructed to

deliver a $5,000 check to **JEFFREY BEASLEY** for the Kilpatrick Civic

Fund.

    C.   On August 17, 2006, the Police and Fire Retirement System

conditionally approved a $20 million investment in a joint venture/private

equity real estate investment, which was presented to the board by *Company

C*. **JEFFREY BEASLEY** voted in favor of this investment.

    D.   On September 7, 2006, the $5,000 check from *Company C*,

previously written by the Principal of *Companies C and D*, was deposited into

the Kilpatrick Civic Fund account.

    E.   On September 7, 2006, at a meeting of the Police and Fire Retirement

System, **JEFFREY BEASLEY** made a motion that *Company D* be hired by

the Board as an investment manager.    The motion passed.

F.    These companies received substantial fees from the Police and Fire

Retirement System.

24. ***Company E***

A.    *Company E* was an investment company that sought investment

funds from the pension funds.    **JEFFREY BEASLEY** solicited contributions

to the Kilpatrick Civic Fund from *Company E* through a consultant for

*Company E*.    On September 5, 2007, the consultant for the *Company E* gave

$20,000 to the Kilpatrick Civic Fund.

B.    On September 27, 2007, **JEFFREY BEASLEY** brought a motion

before the Police and Fire Retirement System to conditionally invest $10

million in *Company E*.    The motion passed, and subsequently the Police and

Fire Retirement System actually invested only $5 million in *Company E*.

C.    On October 16, 2007, *Company E* gave $10,000 to the Kilpatrick

Civic Fund.

D.    On November 28, 2007, the General Retirement System voted to

conditionally invest $10 million in *Company E*.    **JEFFREY BEASLEY**

voted in favor of this investment.    Subsequently, the General Retirement

System actually invested only $5 million in *Company E*.

E.    *Company E* received substantial fees from the Retirement Systems

during the course of the conspiracy.

F.    The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries had suffered a loss of $4,999,000 on its investment in *Company E*.

G.    In Chicago, Illinois, during the course of and in furtherance of the conspiracy, **JEFFREY BEASLEY** asked *Company E's* consultant for cash. The consultant then gave **JEFFREY BEASLEY** $3,000 in cash.    On other occasions during the course of the conspiracy, **JEFFREY BEASLEY** asked the consultant for additional sums of money.

25.    ***Company F***

A.    *Company F* was a private equity firm that sought investment funds from both Retirement Systems.

B.    On October 19, 2005, the General Retirement System conditionally approved a $10 million investment in the *Company F Fund*, which was managed by *Company F*.    During the course of the conspiracy, *Company F* received substantial fees from the General Retirement System.

C.    On April 6, 2006, the Police and Fire Retirement System conditionally approved a $10 million investment proposed by *Company F*. During the course of the conspiracy, *Company F* received substantial fees from the Police and Fire Retirement System.

18

D.   In approximately May 2006, **JEFFREY BEASLEY** informed a

representative of *Company F* that *Company F* needed to contribute $10,000 to

the Kilpatrick Civic Fund and solicit another $10,000 donation to the

Kilpatrick Civic Fund from company employees in order to obtain final

approval of *Company F's* investment request from the Police and Fire

Retirement System.   The *Company F* representative agreed to donate the

$10,000 and attempt to obtain another $10,000.

E.   On May 18, 2006, **JEFFREY BEASLEY** brought a motion before

the Police and Fire Retirement System to waive prior investment restrictions

and invest $10 million in *Company F*.   **JEFFREY BEASLEY** and the Police

and Fire Retirement System then voted in favor of making the $10 million

investment in *Company F*.

F.   On June 23, 2006, *Company F* gave $10,000 to the Kilpatrick Civic

Fund.

G.   On September 5, 2007, *Company F* gave $10,000 to the Kilpatrick

Civic Fund.

26.   ***MayfieldGentry Realty Advisors***

A.   During the times relevant to this Superseding Indictment,

*MayfieldGentry Realty Advisors L.L.C.* was an investment manager for the

Police and Fire Retirement System, managing over $150 million in properties

19

owned by the System. Chauncey Mayfield was the Chief Executive Officer and principal owner of *MayfieldGentry Realty Advisors*. During this period of time, *MayfieldGentry Realty Advisors* received substantial fees from the Police and Fire Retirement System. As an investment manager, *MayfieldGentry Realty Advisors* served at the direction of the Board. In addition, *MayfieldGentry Realty Advisors* promoted an additional investment known as the *Genesis Value Fund*.

B. On June 8, 2006, the Police and Fire Retirement System conditionally approved a $20 million investment in the *Genesis Value Fund*. **JEFFREY BEASLEY** voted in favor of this investment.

C. Chauncey Mayfield, on behalf of *MayfieldGentry Realty Advisors*, complied with requests by **JEFFREY BEASLEY** to give money to the Kilpatrick Civic Fund. On June 23, 2006, Chauncey Mayfield gave $10,000 to the Kilpatrick Civic Fund. On September 5, 2007, Chauncey Mayfield gave $30,000 to the Kilpatrick Civic Fund. On June 24, 2008, Chauncey Mayfield gave $10,000 to the Kilpatrick Civic Fund.

D. Besides complying with **JEFFREY BEASLEY's** requests to give money to the Kilpatrick Civic Fund, Chauncey Mayfield provided other items of value to **JEFFREY BEASLEY** and other conspirators. In April 2007, **JEFFREY BEASLEY** asked Chauncey Mayfield to include Kwame

20

Kilpatrick, **JEFFREY BEASLEY**, and three other associates on a private jet flight that *MayfieldGentry Realty Advisors* had chartered to Las Vegas over the weekend of April 13, 2007, for a golfing trip. The cost of the flight was approximately $43,000. In addition, *MayfieldGentry Realty Advisors* paid for greens fees, lodging, meals, limousine service, concert tickets, and massages for Kwame Kilpatrick, **JEFFREY BEASLEY**, and the three other associates at a cost of approximately $23,000, which was not reimbursed.

E.    In July 2007, **JEFFREY BEASLEY** asked Chauncey Mayfield to charter a private plane for Kwame Kilpatrick to fly to Tallahassee, Florida. At a cost of more than $24,000, *MayfieldGentry Realty Advisors* then chartered the private plane so that Kwame Kilpatrick could go on a trip to Tallahassee over the weekend of July 20, 2007. One of the passengers on the flight to Tallahassee was the son of **JEFFREY BEASLEY**. No one from *MayfieldGentry Realty Advisors* went on this trip nor was *MayfieldGentry Realty Advisors* reimbursed by Kwame Kilpatrick or **JEFFREY BEASLEY**.

F.    On July 25, 2007, **JEFFREY BEASLEY** asked Chauncey Mayfield to give a job to **JEFFREY BEASLEY's** paramour. Subsequently, Chauncey Mayfield hired **JEFFREY BEASLEY's** paramour to work at *MayfieldGentry Realty Advisors*.

G.    In September 2007, **JEFFREY BEASLEY** asked Chauncey

Mayfield to charter a private plane so that Kwame Kilpatrick could fly to Bermuda, purportedly on business of the Kilpatrick Civic Fund. At a cost of more than $34,000, *MayfieldGentry Realty Advisors* then chartered a private plane over the weekend of October 4, 2007 so that Kwame Kilpatrick, his wife, Bernard Kilpatrick, and his companion could go on a trip to Bermuda. No one from *MayfieldGentry Realty Advisors* went on this trip nor was *MayfieldGentry Realty Advisors* reimbursed by Kwame Kilpatrick or **JEFFREY BEASLEY**.

H. In return for the things of value that Chauncey Mayfield gave to **JEFFREY BEASLEY**, Kwame Kilpatrick, and other conspirators, *MayfieldGentry Realty Advisors* maintained its position as an asset manager and investment advisor and thereby earned substantial fees. In addition, *MayfieldGentry Realty Advisors* received approval from the Retirement Systems for a proposal by the principal of *MayfieldGentry Realty Advisors* to move real estate assets, the limits of which are governed by Michigan state statutes, into another investment category by creating real estate trusts. In this way, *MayfieldGentry Realty Advisors* was able to significantly increase the real estate assets under its management and thereby benefit financially through increased fees.

27. ***Company H***

A.   During the period from approximately 1990 to October 2007, the Police and Fire Retirement System retained *Company H* as its consultant on real estate investments.

B.   In August 2007, **JEFFREY BEASLEY** asked a representative of *Company H* to donate $15,000 to the Kilpatrick Civic Fund.   Over the telephone, **JEFFREY BEASLEY** asked the representative of *Company H* to "Send me a love offering from [*Company H*]."   *Company H* did not donate to the Kilpatrick Civic Fund.

C.   On October 11, 2007, following its failure to donate to the Kilpatrick Civic Fund, the Police and Fire Retirement System voted to terminate *Company H* as a consultant on real estate investments after seventeen years of service.   **JEFFREY BEASLEY** voted in favor of the termination.   During the course of the conspiracy, *Trustee B* and **PAUL STEWART** complained that the representative of *Company H* had not been generous in paying for drinks and entertainment for them.   During the October 11, 2007 meeting, *Trustee B* and **PAUL STEWART** also voted in favor of termination.

28. ***Company I***

A.   *Company I* was a media company that sought investment money from the Retirement Systems.

23

B.   On August 22, 2007, the General Retirement System voted to conditionally invest $7.5 million in *Company I*.   **JEFFREY BEASLEY** voted in favor of this investment.

C.   Between September 2007 and July 2008, *Company I* and a consultant for *Company I* gave $45,000 to the Kilpatrick Civic Fund.   These contributions were solicited by **JEFFREY BEASLEY** or *Company I's* consultant.

D.   On September 17, 2008, less than two months after *Company I* had donated $10,000 to the Kilpatrick Civic Fund, **JEFFREY BEASLEY** voted to invest an additional $8 million in *Company I*.   Including the vote of **JEFFREY BEASLEY**, the General Retirement System approved this additional investment.

E.   The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries had suffered a loss of $13.3 million on its investment in *Company I*.

F.   On at least two occasions during the course of the conspiracy, **JEFFREY BEASLEY** asked a principal of *Company I* for money.

**Additional Losses Suffered By the Retirement Systems from Investments from Companies that Donated to the Kilpatrick Civic Fund**

29.   *Company J* was an investment company that received a $5 million investment from the General Retirement System and a $2 million investment from

24

the Police and Fire Retirement System.    In securing these investment monies, *Company J* had made significant donations to the Kilpatrick Civic Fund at the request of **JEFFREY BEASLEY**.    The General Retirement System determined that its fund supporting retirees and beneficiaries suffered a loss of $4.95 million on its investment in *Company J*.    The Police and Fire Retirement System determined that its fund supporting retirees and beneficiaries suffered a loss of $940,000 on its investment in *Company J*.

30.    *Company K* was an off-shore investment company that received a $20 million investment from the General Retirement System and a $20 million investment from the Police and Fire Retirement System.    In securing those investment monies, *Company K* had made significant donations to the Kilpatrick Civic Fund at the request of **JEFFREY BEASLEY**.    The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $20 million investment in *Company K*.    The Police and Fire Retirement System also subsequently determined that its fund supporting retirees and beneficiaries lost all of its $20 million investment in *Company K*.

## JEFFREY BEASLEY BIRTHDAY PARTY

31.   On January 26, 2007, at the Atheneum Hotel in Detroit, **JEFFREY BEASLEY** was the guest of a birthday party thrown in his honor.   The party was organized, in part, by **RONALD ZAJAC**, who solicited large cash donations for the party.   Many of the guests were persons who received compensation, investment monies, or other items of value from the General Retirement System or the Police and Fire Retirement System in various capacities, including providing legal services for the Systems; people seeking investments from the Systems; and consultants for the people seeking investments.   In order to attend the party, **RONALD ZAJAC** asked these people to donate large sums of cash for a birthday present for **JEFFREY BEASLEY**.   During the party, **RONALD ZAJAC** personally gave thousands of dollars in cash to **JEFFREY BEASLEY** as a "birthday present."

## PAUL STEWART BIRTHDAY PARTY

32.   On August 16, 2007, at the Atheneum Hotel in Detroit, **PAUL STEWART** and *Trustee B* of the Police and Fire Retirement System were the guests at a birthday party thrown in their honor.   The party was organized, in part, by **RONALD ZAJAC**, who solicited large cash donations for the party.   Many of the guests were persons who received compensation, investment monies, or other items of value from the Police and Fire Retirement System in various capacities,

including providing legal services for the System; people seeking investments from the System; and consultants for the people seeking investments.   In order to attend the party, **RONALD ZAJAC** asked these people to donate large sums of cash for birthday presents for **PAUL STEWART** and *Trustee B*.   During the party, in a back room, **RONALD ZAJAC** personally gave $5,000 in cash each to **PAUL STEWART** and *Trustee B*.

33.   At the October 18, 2007 meeting of the Police and Fire Retirement System, **JEFFREY BEASLEY** made a motion to substantially increase the hourly rate of *Attorney B*, one of the people who had contributed cash to **JEFFREY BEASLEY, PAUL STEWART**, and *Trustee B* at the parties.   At that same meeting, **PAUL STEWART**, seconded by **JEFFREY BEASLEY**, made a motion to substantially increase the annual salary of **RONALD ZAJAC**, who had organized the parties and had solicited large cash donations for the "birthday presents" for **JEFFREY BEASLEY, PAUL STEWART**, and *Trustee B*. **JEFFREY BEASLEY, PAUL STEWART**, and *Trustee B* voted in favor of both motions.   Those motions passed, with a vigorous dissent.

34.   At the November 7, 2007 meeting of the General Retirement System, **JEFFREY BEASLEY** made a motion to substantially increase the annual salary of **RONALD ZAJAC** for the General Retirement System who had organized the party and had solicited large cash donations for the "birthday present" for

**JEFFREY BEASLEY**.   The motion passed.

35.   Following the October and November 2007 meetings of the two boards
of the Retirements Systems, **RONALD ZAJAC's** total annual compensation from
the two systems was over $400,000.

36.   **RONALD ZAJAC** sought to gain influence with trustees of the two
Retirement Systems by requiring and forcing persons who dealt with, and who
profited from their dealings with, the Retirement Systems to provide the trustees
with drinks, entertainment, meals, tickets for shows and sporting events, limousine
rides, and other things of value.   In Detroit, following the weekly meetings of the
trustees, and during pension conferences outside of Detroit attended by trustees of
the Retirement Systems, **RONALD ZAJAC** directed and organized persons who
dealt with, and who profited from their dealings with, the Retirement Systems to
pay for meals, drinks, entertainment, and other things of value for the trustees.
For example, **RONALD ZAJAC** directed Chauncey Mayfield to pay over $10,000
for limousine rides for trustees of the Retirement Systems during a pension
conference in New York, New York in 2006.

37.   **RONALD ZAJAC** also sought to force one investment sponsor to pay
for two trips to London in the United Kingdom for **RONALD ZAJAC** and trustees
relating to an investment involving *Company P*.   Ostensibly, the two trips to
London were for the purpose of due diligence on a total investment by the

Retirement Systems of $30 million with *Company P*.    In reality, the two trips for

**RONALD ZAJAC** and certain trustees, including *Trustee B*, were merely

disguised international vacations.    When the investment sponsor for *Company P*

sought an additional $10 million investment from the Police and Fire Retirement

System, **RONALD ZAJAC** conditioned the additional investment money on a

third trip to London for **RONALD ZAJAC** and certain trustees.    When the

investment sponsor refused to supply the third trip to London, no further

investment money was approved by the Police and Fire Retirement System.    As

part of the conspiracy, a representative of *Company P* paid over $300,000 to

Bernard Kilpatrick in order to secure the approval of the Retirements Systems' $30

million investment in *Company P*.    Bernard Kilpatrick worked with **JEFFREY**

**BEASLEY** and **RONALD ZAJAC** in order to get approval for *Company P's*

investment.

38.    **PAUL STEWART** and *Trustee B* collected over ten thousand dollars

from investment sponsors and others, including **ROY DIXON** and **RONALD**

**ZAJAC**, for their election "campaigns" for leadership of the Detroit Police

Officers Association.    Subsequently, however, **PAUL STEWART** and *Trustee B*

split their "campaign" money received from the investment sponsors, and then they

used the money for personal purposes and not for campaign expenses.    **PAUL**

**STEWART** retained thousands of dollars from the investment sponsors for his

own personal expenses.

## COMPANY L

39. *Company L* was an investment firm specializing in the communications industry that sought investment money from the Retirement Systems.

40. On March 15, 2006, *Company L* entered into a consulting contract with Marc Andre Cunningham, who, according to the terms of the contract, was to receive $25,000 quarterly for three years. In approximately July 2006, Cunningham became Mayor of Detroit Kwame Kilpatrick's executive assistant.

41. On March 26, 2006, Cunningham introduced **JEFFREY BEASLEY** to one of the principals of *Company L* who wanted to obtain investments from the Retirement Systems for a private equity fund that he was promoting.

42. On May 3, 2006, the General Retirement System voted to conditionally approve a $15 million investment in *Company L*, with **JEFFREY BEASLEY** voting in favor of the investment.

43. On May 18, 2006, the Police and Fire Retirement System voted to conditionally approve a $15 million investment in *Company L*, with **JEFFREY BEASLEY** voting in favor of the investment.

44. During the course of the conspiracy, **JEFFREY BEASLEY** solicited contributions from *Company L* to the Kilpatrick Civic Fund.

45. On June 30, 2006, *Company L* gave $25,000 to the Kilpatrick Civic Fund.

46. On October 16, 2007, *Company L* gave $10,000 to the Kilpatrick Civic Fund.

47. On October 4, 2006, at the direction of Kwame Kilpatrick, Cunningham met with Bernard Kilpatrick at the Coleman A. Young Municipal Center and provided Bernard Kilpatrick with at least $4,000 in cash.   It was understood between Cunningham and Kwame Kilpatrick that this and future payments were to be made to Bernard Kilpatrick to reward Kwame Kilpatrick for his support of the investments by the General Retirement System and the Police and Fire Retirement System.   Following the October 2006 payment, while continuing to receive his $25,000 quarterly payments from *Company L*, Cunningham continued to kick back a portion of this money to Bernard Kilpatrick.

48. While receiving his $25,000 quarterly payments from *Company L*, Cunningham also kicked back a portion of these payments to **JEFFREY BEASLEY** by giving him cash.   In total, Cunningham gave approximately $20,000 in cash to **JEFFREY BEASLEY**.

## *Onyx Capital Advisers* and *PR Investment Group*

49. Through *Onyx Capital Advisers* and on behalf of *PR Investment Group*, **ROY DIXON** sought investment monies from the Retirement Systems during the

course of the conspiracy. *Onyx Capital Advisers* sought to act as a private equity firm that invested money in other companies. *PR Investment Group* sought to develop real estate in the Turks and Caicos Islands.

50. On December 21, 2006, the Police & Fire Retirement System voted to conditionally approve a $10 million investment with *Onyx Capital Advisers*. The motion was made by *Trustee C*, and it was seconded by *Trustee B*. **JEFFREY BEASLEY**, **PAUL STEWART**, *Trustee C*, and *Trustee B* all voted in favor of the investment.

51. On January 10, 2007, the General Retirement System voted to conditionally approve a $10 million investment with *Onyx Capital Advisers*. **JEFFREY BEASLEY** voted in favor of the investment.

52. On May 31, 2007, **JEFFREY BEASLEY** brought a motion before the Police and Fire Retirement System to approve the request by **ROY DIXON**, the owner of *Onyx Capital Advisers*, to eliminate an investment restriction that would otherwise prohibit the $10 million investment from going forward. In addition, **JEFFREY BEASLEY** moved that the Police and Fire Retirement System authorize up to $10 million in wire transfers to *Onyx Capital Advisers*. The motions were seconded by *City Official B*, and **PAUL STEWART**, *Trustee C*, and *Trustee B* also voted in favor of the motions. Both motions were approved.

53. On June 6, 2007, **JEFFREY BEASLEY,** brought a motion before the

General Retirement System to approve the request by **ROY DIXON**, the owner of

*Onyx Capital Advisers*, to eliminate an investment restriction that would otherwise

prohibit the General Retirement System from making the requested investment.

**JEFFREY BEASLEY** also brought a motion to authorize up to $10 million in

wire transfers to *Onyx Capital Advisers*.

54.    In August 2007, **ROY DIXON** paid for a vacation at a luxury hotel in

the Turks and Caicos Islands for **JEFFREY BEASLEY**, his wife, and their

children.    During the vacation, **ROY DIXON** gave money to **JEFFREY**

**BEASLEY** for gambling and other expenses.    **ROY DIXON** did these things for

**JEFFREY BEASLEY** as bribes and kickbacks for **JEFFREY BEASLEY's**

support of investment money from the Retirement Systems for *Onyx Capital*

*Advisers* and *PR Investment Group*.

55.    At various times between August 2007 and December 2007, **ROY**

**DIXON** gave $15,000 in cash bribes to *City Official A*, a member of the staff of

*City Official B,* an official of the City of Detroit, so that *City Official A* would

assist **ROY DIXON's** efforts to secure investment money from the Police and Fire

Retirement System on behalf of *PR Investment Group*.

56.    On August 22, 2007, **ROY DIXON** gave $1,000 to the non-profit

organization of *City Official B*.

57.    On August 23, 2007, *City Official B* successfully brought a motion

before the Police and Fire Retirement System to approve the request by **ROY DIXON** that representatives of the *PR Investment Group* be invited to make a presentation before the Board of Trustees.   *Trustee B*, **PAUL STEWART**, and *Trustee C* all voted in favor of the motion.

58.   **ROY DIXON** and *Onyx Capital Advisers* used investment monies from the Retirement Systems to invest in *Company N*.   *Company N* was a company which specialized in the sale of automobiles to people with bad credit, and it was supposed to use the investment monies for its operations.

59.   On September 5, 2007, **ROY DIXON** gave $20,000 to the Kilpatrick Civic Fund.

60.   On September 5, 2007, the owner of *Company N* gave $10,000 to the Kilpatrick Civic Fund.

61.   On September 19, 2007, a representative of *PR Investment Group* made a presentation about its investment proposal before the General Retirement System.

62.   On September 20, 2007, a representative of *PR Investment Group* made a presentation about its investment proposal before the Police and Fire Retirement System.

63.   On October 5, 2007, **ROY DIXON** gave $3,400 to the re-election campaign of *City Official B*.

64.   On October 11, 2007, **JEFFREY BEASLEY**, **PAUL STEWART**,

Trustee B, *City Official B*, and the Police and Fire Retirement System voted to approve **ROY DIXON's** request that the System wire $1,150,000 to *Onyx Capital Advisers*.

65.     In December 2007, **ROY DIXON** paid for a trip to the Turks and Caicos Islands for *City Official B*.

66.     On February 21, 2008, **JEFFREY BEASLEY** successfully brought a motion before the Police and Fire Retirement System indicating the Board of Trustees' support for an investment in the Turks and Caicos Islands with *PR Investment Group*.     **PAUL STEWART**, *Trustee B*, and *Trustee C* all voted in favor of the motion.

67.     On February 27, 2008, **JEFFREY BEASLEY** voted in favor of a motion before the General Retirement System indicating the Board of Trustees' support for an investment in the Turks and Caicos Islands with *PR Investment Group*.

68.     On July 3, 2008, **ROY DIXON** gave $10,000 to the Kilpatrick Civic Fund.     69.     On July 3, 2008, the owner of *Company N* gave $5,000 to the Kilpatrick Civic Fund.

70.     On July 10, 2008, **PAUL STEWART**, seconded by *Trustee C*, made a motion before the Police and Fire Retirement System supporting a second due diligence regarding the proposed investment in the Turks and Caicos Islands with

*PR Investment Group.*   **JEFFREY BEASLEY** and *Trustee B* also voted in favor of the motion.

71.    In September 2008, the owner of *Company N*, under the direction of **ROY DIXON**, gave a job as a manager of a *Company N* dealership in Burton, Michigan to the brother of *Trustee C* in order to secure the continued support of *Trustee C*.   Subsequently, **ROY DIXON** directed the owner of *Company N* to hire the brother of *Trustee C* as the General Sales Manager of *Company N* in Atlanta, Georgia.

72.    In December 2008, **ROY DIXON** paid for **PAUL STEWART** and his paramour to travel to Naples, Florida for a vacation and to attend a New Year's Eve party at a residence of **ROY DIXON**.

73.    During the course of the conspiracy, **ROY DIXON** gave cash and other things of value to **PAUL STEWART** and *Trustee B*.

74.    During the course of the conspiracy, **ROY DIXON** embezzled approximately $3 million in pension monies from the General Retirement System and the Police and Fire Retirement System for his personal use.

75.    The General Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $10 million investment in *Onyx Capital Advisers*.

76. The Police and Fire Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of its $10 million investment in *Onyx Capital Advisers*.

## *COMPANY O*

77. *Company O* was an investment firm specializing in real estate investments in apartment complexes that sought investment money from the Police and Fire Retirement System.

78. In 2007, *Company O* entered into a consulting contract with *Person A*. *Person A* was to act as a third party marketer for *Company O* in its effort to secure investment money from the Police and Fire Retirement System.   During the course of the contract, *Company O* paid *Person A* $20,000 between May 2007 and August 2007.   In 2007, *Company O* requested a $2 million investment from the Police and Fire Retirement System.   In 2008, *Company O* sought an additional investment of $20 million from the Police and Fire Retirement System.

79. On June 21, 2007, the Police and Fire Retirement System voted to conditionally approve a $2 million investment in *Company O*, with **JEFFREY BEASLEY** voting in favor of the investment.

80. On December 6, 2007, the Police and Fire Retirement System voted to give its final approval for the $2 million investment in *Company O*, with **JEFFREY BEASLEY** voting in favor of the investment.

81.   In December 2007, the owners of *Company O* gave **JEFFREY BEASLEY** a Cartier watch worth $1,800.

82.   On April 17, 2008, the Police and Fire Retirement System voted to conditionally approve a $20 million investment in *Company O*, with **JEFFREY BEASLEY** voting in favor of the investment.

83.   On September 18, 2008, the Police and Fire Retirement System voted to give its final approval of the $20 million investment in *Company O*, with **JEFFREY BEASLEY** voting in favor of the investment.

84.   During the course of the conspiracy, **JEFFREY BEASLEY** solicited contributions from *Company O* to the Kilpatrick Civic Fund.

85.   On September 5, 2007, *Company O* caused $12,000 to be given to the Kilpatrick Civic Fund.

86.   On July 3, 2008, *Company O* gave $15,000 to the Kilpatrick Civic Fund.

87.   While receiving his $20,000 in payment from *Company O* in 2007 relating to the request for the $2 million investment, *Person A* kicked back a portion of this payment to **JEFFREY BEASLEY** by giving him cash.   In total, *Person A* gave approximately $10,000 in cash to **JEFFREY BEASLEY**.

### *THIRD PARTY MARKETER Q*

88.   *Third Party Marketer Q* was a former trustee of the Police and Fire Retirement System who acted as a third party marketer for individuals and

38

companies seeking investment money from the Retirement Systems.   *Third Party Marketer Q* represented a number of different investment sponsors who sought investment money from the Police and Fire Retirement System, including *Company A*.   During the course of the conspiracy, *Third Party Marketer Q* gave **PAUL STEWART** approximately $11,000 in cash bribes in order to influence and reward **PAUL STEWART** for his votes as a trustee of the Police and Fire Retirement System.   During the course of the conspiracy, *Third Party Marketer Q* gave *Trustee B* approximately $11,000 in cash bribes in order to influence and reward *Trustee B* for his votes as a trustee of the Police and Fire Retirement System.

## COMPANY R

89.   *Company R* was a company that sought an investment deal with the Police and Fire Retirement System involving a deep injection waste well in Romulus, Michigan.   The well had been a long-term investment by the Retirement System, involving over $40 million in assets of the Retirement System. In approximately November 2006 and continuing through the course of the conspiracy, the principal of *Company R* sought to invest in the Retirement System's waste well in an effort to make millions of dollars in profits.   In addition, during the course of the conspiracy, the principal of *Company R* acted as a third party marketer for other investment sponsors seeking money from the

Retirement Systems. From his work as a third party marketer during the course of the conspiracy, the principal of *Company R* earned hundreds of thousands of dollars in fees from the investment sponsors with whom he worked. In addition, the principal of *Company R* had, and sought, investments with the Retirement Systems in his own right that were worth millions of dollars.

90. During the course of the conspiracy, the principal of *Company R* gave a $5,000 casino chip as a bribe to **PAUL STEWART** in order to influence and reward **PAUL STEWART** in his votes as a trustee of the Police and Fire Retirement System. On three different occasions during the course of the conspiracy, the principal of *Company R* gave $5,000 casino chips to *Trustee B* as bribes in order to influence and reward *Trustee B* in his votes as a trustee of the Police and Fire Retirement System.

91. During the course of the conspiracy, and in coordination with **JEFFREY BEASLEY**, the principal of *Company R* acted as a fund raiser for the Kilpatrick Civic Fund.

92. In connection with the "birthday parties" held for **JEFFREY BEASLEY, PAUL STEWART**, and *Trustee B*, the principal of *Company R* assisted **RONALD ZAJAC** in organizing the parties and soliciting the money to be given to the trustees of the Retirement Systems. The principal of *Company R*

also supplied hotel suites at a hotel that he controlled as a location for the "birthday parties."

## LOSSES SUFFERED BY THE RETIREMENT SYSTEMS

93.    Collectively, as detailed earlier, the funds of the General Retirement System and the Police and Fire Retirement System, that support retirees and beneficiaries, suffered losses of at least $84.18 million from investments associated with the scheme to defraud and with the acts of **JEFFREY BEASLEY, ROY DIXON, PAUL STEWART**, and **RONALD ZAJAC** in furtherance of the conspiracy.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 2

### (18 U.S.C. § 1951 - Interference with Commerce by Extortion)

**D-1 JEFFREY BEASLEY**

On or about January 26, 2007, in the Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is, thousands of dollars in cash which were supposedly birthday gifts, from persons doing business with the Detroit General Retirement System and the Police and Fire Retirement System, with the consent of the givers, under color of official right, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

41

## COUNT 3

**(18 U.S.C. § 1951 - Interference with Commerce by Extortion)**

**D-1 JEFFREY BEASLEY**

At various times from in or about February 2007 until in or about 2008, in the Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is, thousands of dollars in cash and other things of value, from the owner of *Company A*, who obtained investments from the Detroit General Retirement System and the Police and Fire Retirement System, with the consent of the giver, under color of official right and by wrongful fear of economic harm, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 4

**(18 U.S.C. § 1951 - Interference with Commerce by Extortion)**

**D-1 JEFFREY BEASLEY**

At various times from at least January 18, 2007 until in or about March 2009, in the Eastern District of Michigan, the defendant, **JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is, thousands of dollars in cash, relating to the investments by the Detroit General Retirement System and the Police and Fire Retirement System in *Company L*, with the consent of the giver, under color of official right, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 5

**(18 U.S.C. § 1951 - Interference with Commerce by Extortion)**

**D-1 JEFFREY BEASLEY**

In or about April 2007, in the Eastern District of Michigan, the defendant,

**JEFFREY BEASLEY**, did knowingly and unlawfully obtain property, that is,

travel and entertainment worth approximately sixty-seven thousand dollars, from

Chauncey Mayfield, the principal owner of *MayfieldGentry Realty Advisors*, which

was acting as an investment manager for the Detroit General Retirement System

and the Police and Fire Retirement System, with the consent of the giver, under

color of official right, which conduct affected interstate commerce.

In violation of Title 18, United States Code, Section 1951.

## COUNT 6

**(18 U.S.C. § 1951 - Attempted Interference with Commerce by Extortion)**

**D-1 JEFFREY BEASLEY**

In or about August 2007, in the Eastern District of Michigan, the defendant,

**JEFFREY BEASLEY**, did knowingly and unlawfully attempt to obtain property,

that is, fifteen thousand dollars, from a representative of *Company H*, with the

consent of the giver, under color of official right and by wrongful fear of economic

harm, which conduct affected interstate commerce.

43

In violation of Title 18, United States Code, Section 1951.

## COUNT 7

### (18 U.S.C. § 666(a)(1)(B) - Acceptance of Bribes)

**D-1 JEFFREY BEASLEY**

In or about August 2007, in the Eastern District of Michigan, Southern

Division, and elsewhere, the defendant, **JEFFREY BEASLEY**, did knowingly

and corruptly agree to accept and accept a vacation to the Turks and Caicos Islands

for himself, his wife, and their children from **ROY DIXON**, intending to be

influenced and rewarded in connection with his official duties regarding a

business, transaction, or series of transactions of the City of Detroit, involving

$5,000 or more, that is, investments and proposed investments with *Onyx Capital*

*Advisers* and *PR Investment Group*.

All in violation of Title 18, United States Code, Section 666(a)(1)(B).

## COUNT 8

### (18 U.S.C. § 666(a)(2) - Payment of Bribes)

**D-2 ROY DIXON**

Division, and In or about August 2007, in the Eastern District of Michigan,

Southern elsewhere, the defendant, **ROY DIXON**, did knowingly and corruptly

offer and give **JEFFREY BEASLEY** a vacation to the Turks and Caicos Islands

for **BEASLEY**, his wife, and their children intending to influence and reward

44

**JEFFREY BEASLEY** regarding a business, transaction, or series of transactions of the City of Detroit, involving $5,000 or more, that is, investments and proposed investments with *Onyx Capital Advisers* and *PR Investment Group*.

All in violation of Title 18, United States Code, Section 666(a)(2).

## COUNT 9

### (18 U.S.C. § 666(a)(2) - Payment of Bribes)

**D-2 ROY DIXON**

At various times from in or about August 2007 until in or about December 2007, in the Eastern District of Michigan, Southern Division, the defendant, **ROY DIXON**, did knowingly and corruptly give *City Official A*, an agent of the City of Detroit, approximately $15,000 in cash intending to influence and reward the city official regarding a business, transaction, or series of transactions of the City of Detroit, involving $5,000 or more, that is, the effort by **ROY DIXON** to secure investment money for *Onyx Capital Advisers* and *PR Investment Group*.

All in violation of Title 18, United States Code, Section 666(a)(2).

## COUNT 10

### (18 U.S.C. § 1349 - Conspiracy to Commit Wire Fraud)

**D-2 ROY DIXON**

1.    The allegations contained in all preceding paragraphs are hereby re-alleged and incorporated by reference in this Count as if fully set forth herein.

2.    From in or about September 2006 and continuing through at least in or about April 2010, both dates being approximate, in the Eastern District of Michigan, Southern Division, and elsewhere, the defendant, **ROY DIXON**, did unlawfully, knowingly, and willfully combine, conspire, confederate, and agree with the owner of *Company N* to engage in wire fraud, in violation of Title 18, United States Code, Section 1343.

## MANNER AND MEANS OF THE CONSPIRACY

The manner and means by which **ROY DIXON** and the owner of *Company N* sought to accomplish the conspiracy and the scheme to defraud, included, among other things:

3.    During the course of the conspiracy, **ROY DIXON** sought and secured $25 million in investment money from the Detroit General Retirement System, the Detroit Police and Fire Retirement System, and the General Employees Retirement System of the City of Pontiac, Michigan.   The money was to be invested in the *Onyx Capital Advisory Fund I, LP*, a limited partnership acting as a private equity fund, with *Onyx Capital Advisers* acting as general partner, and the three pension funds acting as limited partners.

4.    **ROY DIXON** represented to the Boards of Trustees of the three pension funds that he and *Onyx Capital Advisers* would use the $25 million invested in the *Onyx Capital Advisory Fund I* in the best interests of the pension funds so as to

46

maximize the return on investment and to act in accordance with the written partnership agreement entered into between *Onyx Capital Advisers* and the three funds.    During the course of the conspiracy, **ROY DIXON** presented written capital calls to the three pension funds requesting the wire transfer of money from the funds to the *Onyx Capital Advisory Fund I* purportedly for the purposes stated in the capital calls.

5.    During the course of the conspiracy, **ROY DIXON** and his co-conspirator embezzled over $3 million from the three pension funds through the *Onyx Capital Advisory Fund I* and its investments in *Company N* and related entities.    Above and beyond the $1.3 million in management fees owed and paid to *Onyx Capital Advisers* under the terms of the agreement with the three pension funds, **ROY DIXON** embezzled pension fund money for his own benefit by (1) double-billing the Pontiac General Employees Retirement System for $200,000 in management fees that had already been paid, (2) withdrawing over $1.8 million from the *Onyx Capital Advisory Fund I* for his own benefit, sometimes in the form of what were called "advanced management fees," and (3) directing approximately $1 million in pension fund money to *Company N* and related entities, which was then used to benefit **ROY DIXON**, his family members, or the owner of *Company N*.    During the course of the conspiracy, **ROY DIXON** withdrew pension fund money from the *Onyx Capital Advisory Fund I* whenever he wanted, for his own benefit, and

not for the purposes stated in the capital calls to the three pension funds.   For

example, on at least fifteen occasions between 2007 and 2009, **ROY DIXON**

withdrew pension fund money from the *Onyx Capital Advisory Fund I's* bank

accounts to cover overdrafts in his own personal accounts or in the bank accounts

of *Onyx Capital Advisers*.

6.   From October 2008 through December 2008, under the direction of **ROY**

**DIXON**, the owner of *Company N* used approximately $521,000 in pension fund

money, that purportedly had been invested in *Company N* and related entities, to

pay some of the construction costs of **ROY DIXON's** new personal residence near

Atlanta, Georgia.

7.   **ROY DIXON** also directed that pension fund money that had been

invested in *Company N* and related entities be funneled, in the form of hundreds of

thousands of dollars in cash deposits, back to *Onyx Capital Advisers* and **ROY**

**DIXON's** own personal bank account for his own personal benefit and in order to

conceal shortfalls in the accounts of *Onyx Capital Advisers* and the *Onyx Capital*

*Advisory Fund I* caused by the embezzlement of pension fund money.

8.   As part of the conspiracy, on or about November 5, 2007, **ROY DIXON**

represented to the Board of Trustees of the Pontiac General Employees Retirement

System that *Person B*, who had years of experience in the private equity field, was

an owner of *Onyx Capital Advisers* and that *Person B* was devoting 100% of his

time to working for *Onyx Capital Advisers*. The Board of Trustees relied on this representation in deciding to begin releasing investment money to the *Onyx Capital Advisory Fund I*. In truth and in fact, however, as **ROY DIXON** well knew when he made the representation, *Person B* was not an owner of *Onyx Capital Advisers*, and *Person B* was not devoting 100% of his time to working for *Onyx Capital Advisers*, since *Person B* was employed full-time by another company during all times relevant to this Superseding Indictment.

9. It was part of the conspiracy that there would be transmitted by means of wire in interstate commerce certain writings, signs, signals, and sounds, including the interstate wire transfer of money, in order to accomplish the goals and objectives of the conspiracy.

10. The City of Detroit's General Retirement System and Police and Fire Retirement System subsequently determined that their funds supporting retirees and beneficiaries lost all of their $20 million investment with **ROY DIXON** and *Onyx Capital Advisers*. The Pontiac General Employees Retirement System subsequently determined that its fund supporting retirees and beneficiaries lost all of the $3.8 million that the system actually invested with **ROY DIXON** and *Onyx Capital Advisers*.

All in violation of Title 18, United States Code, Section 1349.

## COUNT 11

### (18 U.S.C. § 1343 - Wire Fraud)

**D-2 ROY DIXON**

1.    The allegations contained in all preceding paragraphs are hereby re-alleged and incorporated by reference in this Count as if fully set forth herein.

2.    On or about November 28, 2007, in the Eastern District of Michigan, Southern Division, and elsewhere, for the purpose of executing a scheme to defraud, the defendant, **ROY DIXON**, did knowingly cause to be transmitted by means of wire in interstate commerce certain writings, signs, signals, and sounds, which constituted the transfer by wire of $51,583 belonging to the Pontiac General Employees Retirement System to a bank account of the *Onyx Capital Advisory Fund I*, based on false and fraudulent representations made by **ROY DIXON** in a letter dated November 5, 2007.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 12

### (18 U.S.C. § 1343 - Wire Fraud)

**D-2 ROY DIXON**

1.    The allegations contained in all preceding paragraphs are hereby re-alleged and incorporated by reference in this Count as if fully set forth herein.

2.    From in or about August 2008 until on or about December 31, 2008, in

the Eastern District of Michigan, Southern Division, and elsewhere, for the

purpose of executing a scheme to defraud, the defendant, **ROY DIXON**, did

knowingly cause to be transmitted by means of wire in interstate commerce certain

writings, signs, signals, and sounds, which constituted the transfer by wire of

money belonging to the Detroit General Retirement System, the Detroit Police and

Fire Retirement System, and the Pontiac General Employees Retirement System to

a bank account of the *Onyx Capital Advisory Fund I*, based on false and fraudulent

representations made by **ROY DIXON** that the money would be invested for the

benefit of the three Retirement Systems, when **ROY DIXON** actually intended and

did cause to be used approximately $513,000 of the three Retirement Systems'

money to pay construction costs on his new personal residence.

All in violation of Title 18, United States Code, Sections 1343 and 2.

## COUNT 13

### (31 U.S.C. § 5324(a)(3) - Structuring of Financial Transactions)

**D-2 ROY DIXON**

On or about the dates set forth below, in the Eastern District of Michigan, and

elsewhere, defendant **ROY DIXON**, did knowingly, willfully, and for the purpose

of evading the currency reporting requirements of Title 31, United States Code,

Section 5313(a), and the regulations prescribed thereunder, structure and assist in

structuring transactions with the domestic financial institutions identified below by

intentionally depositing and causing to be deposited less than $10,000 in United

States currency into the accounts identified below in order that Currency

Transaction Reports would not be filed:

| Deposit Date | Institution and Account | Cash Deposited |
|---|---|---|
| 12/16/2008 | BB&T - **ROY DIXON's** personal account | $9,000 |
| 12/17/2008 | BB&T - **ROY DIXON's** personal account | $9,000 |
| 12/19/2008 | BB&T - **ROY DIXON's** personal account | $9,200 |
| 12/19/2008 | Wachovia - **ROY DIXON's** personal account | $5,000 |
| 12/22/2008 | BB&T - *Onyx Capital Advisers'* account | $9,500 |
| 12/23/2008 | BB&T - **ROY DIXON's** personal account | $9,000 |
| 12/23/2008 | Wachovia - **ROY DIXON's** personal account | $9,000 |
| 12/23/2008 | Wachovia - *Onyx Capital Advisers'* account | $9,500 |
| 12/29/2008 | National City - *Onyx Capital Advisers'* account | $8,000 |
| 12/30/2008 | National City - *Onyx Fund's* account | $8,000 |
| 12/31/2008 | National City - *Onyx Capital Advisers'* account | $8,500 |

All in violation of Title 31, United States Code, Section 5324(a)(3) and Title

18, United States Code, Section 2.

## CRIMINAL FORFEITURE ALLEGATIONS

### (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461)

1.   Upon conviction of one or more counts of conspiracy to commit honest services mail and wire fraud, interference with commerce by extortion, and acceptance of bribes, in violation of Title 18, United States Code, Sections 1349, 1951, and 666, as alleged in Counts 1, 2, 3, 4, 5, and/or 7 of this Superseding Indictment, defendants **JEFFREY BEASLEY**, **PAUL STEWART**, and **RONALD ZAJAC** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, their right, title, and interest in any property, real or personal, which constitutes or is derived from proceeds traceable to conspiracy to commit honest services mail and wire fraud, interference with commerce by extortion, or acceptance of bribes, in violation of 18 U.S.C. §§ 1349, 1951, and 666.

2.   Upon conviction of one or more counts of conspiracy to commit honest services mail and wire fraud, payment of bribes, conspiracy to commit wire fraud, wire fraud, and the structuring of financial transactions in violation of Title 18, United States Code, Sections 1349, 666, and 1343, and Title 31, United States Code, Section 5324(a)(3), as alleged in Counts 1, 8, 9, 10, 11, 12, and/or 13 of this Superseding Indictment, Defendant **ROY DIXON** shall forfeit to the United States, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, his right, title, and

interest in any property, real or personal, which constitutes or is derived from proceeds traceable to conspiracy to commit honest services mail and wire fraud, payment of bribes, conspiracy to commit wire fraud, wire fraud, and the structuring of financial transactions, in violation of 18 U.S.C. §§ 1349, 666, and 1343, and 31 U.S.C. § 5324(a)(3).

3.   Property subject to forfeiture to the United States includes, but is not limited to, the following:

A.   Approximately seventy thousand dollars ($70,000.00) in United States Currency from **JEFFREY BEASLEY**, as monies obtained from the owner of *Company A*, as alleged in Counts 1 and/or 3 of this Superseding Indictment;

B.   Approximately ten thousand dollars ($10,000.00) in United States Currency from **JEFFREY BEASLEY**, as monies related to the January 26, 2007 party, as alleged in Counts 1 and/or 2 of this Superseding Indictment;

C.   Approximately twenty thousand dollars ($20,000.00) in United States Currency from **JEFFREY BEASLEY**, as monies related to the *Company L* deal, as     alleged in Count 1 and/or 4 of this Superseding Indictment;

D.   Approximately one hundred twenty-five thousand dollars ($125,000.00) worth of travel and entertainment expenses related to *MayfieldGentry Realty Advisors* from **JEFFREY BEASLEY**, as alleged in Counts 1 and/or 5 of this Superseding Indictment;

E.   Approximately ten thousand dollars ($10,000.00) in United States Currency from **JEFFREY BEASLEY**, as monies obtained from *Person A*, as alleged in Count 1 of this Superseding Indictment;

F.   Approximately $3 million ($3,000,000.00) in investment money misappropriated by **ROY DIXON** from the three Retirement Systems, as alleged in Count 10 of this Superseding Indictment;

G.   Approximately five thousand dollars ($5,000.00) in United States currency from **PAUL STEWART** relating to the August 2007 party, as alleged in Count 1 of this Superseding Indictment;

H.   Approximately five thousand dollars ($5,000.00) in United States currency from **PAUL STEWART** relating to the casino chip that he received from the principal of *Company R*, as alleged in Count 1 of this Superseding Indictment;

I.   Approximately eleven thousand dollars ($11,000.00) in United States currency from **PAUL STEWART** that he received from *Third Party Marketer Q*, as alleged in Count 1 of this Superseding Indictment;

J.   Approximately five thousand dollars ($5,000.00) in United States Currency from **PAUL STEWART**, as monies obtained from the owner of *Company A*, as alleged in Count 1 of this Superseding Indictment; and

K.   Approximately three thousand dollars ($3,000.00) in United States

Currency from **PAUL STEWART**, as monies obtained from **ROY DIXON**, as alleged in Count 1 of this Superseding Indictment.

4.   Substitute Assets:   Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), Defendants **JEFFREY BEASLEY**, **ROY DIXON**, **PAUL STEWART**, and **RONALD ZAJAC** shall forfeit substitute property, up to the value of the properties described in paragraph 3 above, if, by any act or omission of the defendants, the property described in paragraph 3:

a.   cannot be located upon the exercise of due diligence;

b.   has been transferred, sold to or deposited with a third party;

c.   has been placed beyond the jurisdiction of the court;

d.   has been substantially diminished in value; or

e.  has been commingled with other property which cannot be divided without

difficulty.

All in accordance with Title 18, United States Code, Section 981(a)(1)(C); Title 28,

United States Code, Section 2461(c); and Rule 32.2, Federal Rules of Criminal

Procedure.

THIS IS A TRUE BILL

*s/Grand Jury Foreperson*

Grand Jury Foreperson

**Barbara McQuade**
United States Attorney


*s/Robert Cares*

**Robert Cares**
Assistant United States Attorney


*s/David A. Gardey*

**David A. Gardey**
Assistant United States Attorney


*s/Stephanie Dawkins Davis*

**Stephanie Dawkins Davis**
Assistant United States Attorney


Dated:  April 16, 2014

| United States District Court<br>Eastern District of Michigan | **Criminal Case Cover Sheet** | **Case Number**<br>12-20030 |
| --- | --- | --- |

NOTE: It is the responsibility of the Assistant U.S. Attorney signing this form to complete it accurately in all respects.

**Reassignment/Recusal Information** This matter was opened in the USAO prior to August 15, 2008   [ ]

| **Companion Case Information** | **Companion Case Number:** |
| --- | --- |
| This may be a companion case based upon LCrR 57.10 (b)(4)[1]: | **Judge Assigned:** |
| ☐ Yes    ☐ No | **AUSA's Initials:** |

**Case Title:** USA v.   Jeffrey Beasley, Roy Dixon, Paul Stewart and Ronald Zajac

**County where offense occurred :**   Wayne

**Check One:**    ☒ **Felony**       ☐ **Misdemeanor**       ☐ **Petty**

_____Indictment/_____Information --- **no prior complaint.**
_____Indictment/_____Information --- based upon prior complaint [Case number:                    ]
__✓__Indictment/_____Information --- based upon LCrR 57.10 (d) *[Complete Superseding section below]*

**Superseding Case Information**

**Superseding to Case No:**   12-20030                        **Judge:**   Nancy G. Edmunds

☐ Original case was terminated; no additional charges or defendants.
☒ Corrects errors; no additional charges or defendants.
☐ Involves, for plea purposes, different charges or adds counts.
☐ Embraces same subject matter but adds the additional defendants or charges below:

| **Defendant name** | **Charges** | **Prior Complaint (if applicable)** |
| --- | --- | --- |

**Please take notice that the below listed Assistant United States Attorney is the attorney of record for the above captioned case.**

| April 16, 2014 | s/David A. Gardey |
| --- | --- |
| Date | David A. Gardey<br>Assistant United States Attorney<br>211 W. Fort Street, Suite 2001<br>Detroit, MI  48226-3277<br>Phone:  313-226-9591<br>Fax:    313-226-3265<br>E-Mail address: David.Gardey@usdoj.gov<br>Attorney Bar #:  P-48990 |

[1] Companion cases are matters in which it appears that (1) substantially similar evidence will be offered at trial, (2) the same or related parties are present, and the cases arise out of the same transaction or occurrence. Cases may be companion cases even though one of them may have already been terminated.

04/13